14 Cal.App.3d 40 (1970)
92 Cal. Rptr. 49
THE PEOPLE, Plaintiff and Respondent,
v.
WILEY EMMITT ANDREWS, Defendant and Appellant.
Docket No. 5488.
Court of Appeals of California, Third District.
December 30, 1970.
*42 COUNSEL
Philip V. Sarkisian, under appointment by the Court of Appeal, for Defendant and Appellant.
Thomas C. Lynch, Attorney General, Edsel W. Haws and Frank A. Iwama, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
JANES, J.
Defendant appeals from the judgment entered upon a verdict finding him guilty of the first degree robbery of a service station. (Pen. Code, *43 § 211.) The amended information alleged one prior conviction, which defendant admitted upon arraignment. (1) The order denying a new trial is reviewable with the judgment, but is not itself appealable, and defendant's appeal from that order must be dismissed. (People v. Wilson (1965) 238 Cal. App.2d 447, 450 [48 Cal. Rptr. 55].)
At approximately 1:50 a.m. on March 14, 1969, an automobile occupied by five males drove into a service station near Stockton. After putting in 50 cents worth of gas at the driver's request, the station attendant (Donald Arnpriester) was told by the driver that the man in the right rear seat had a credit card. When Arnpriester approached the right rear window, the man sitting there pointed a handgun at him. The gunman also ordered Arnpriester to pass the cash drawer containing station money to the occupants of the rear seat. After the attendant complied, the car sped north toward Sacramento.
A few minutes later, a highway patrolman, who had received a radio report of the robbery, saw a car matching the description of the robbery car pull off the freeway and stop. Other law enforcement units immediately converged on the scene. The five occupants of the car were arrested. Defendant was found sitting in the rear seat. A .38 caliber bullet was in his shirt pocket. Paper money and change were scattered on the rear seat and floorboard. The cash drawer was found on the ramp where the car had entered the freeway after leaving the station. Two revolvers  .38 caliber and .45 caliber  were found on the off-ramp used by the car as it left the freeway to stop.
At trial, Arnpriester identified defendant as the man who had pointed the gun at him but could not identify the other four occupants of the car. Robert Lee, the driver of the robbery car, and Leon Tucker, who had been sitting up front next to Lee, both testified that defendant was the robber; that two juveniles sitting in back with defendant had helped him in the robbery; and that the guns belonged to the juveniles.

DEFENDANT WAIVED HIS RIGHT TO BE BROUGHT TO TRIAL WITHIN 60 DAYS
The original information against defendant was filed April 10, 1969. An amended information, which merely added an allegation of defendant's prior conviction, was filed June 5, 1969. Trial commenced June 12, 1969, three days over the 60-day period prescribed by Penal Code section 1382, subdivision 2.
(2) There is no merit in defendant's contention that his right to a speedy trial was violated. The court minutes show that on April 17, 1969, when defendant entered his plea of not guilty, "[u]pon request of counsel and *44 defendant, the Court set a Jury Trial for June 12, 1969...." (Italics ours.) Hence, defendant waived any right to complain of the three-day delay. (People v. Wilson (1963) 60 Cal.2d 139, 145-152 [32 Cal. Rptr. 44, 383 P.2d 452].)

THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE VERDICT
Defendant's contention that Arnpriester's testimony contained inconsistencies addresses itself to a matter which was for the trier of fact to determine. (People v. Jackson (1960) 183 Cal. App.2d 332, 341 [6 Cal. Rptr. 505]; People v. Collins (1959) 172 Cal. App.2d 295, 301 [342 P.2d 370].)
(3) Although there was ample evidence that defendant had been drinking heavily for many hours before the robbery, the weight to be accorded defendant's testimony that he was in a drunken sleep at the time it was committed was a question for the jury. (People v. Yeager (1961) 55 Cal.2d 374, 391 [10 Cal. Rptr. 829, 359 P.2d 261].)

DEFENSE COUNSEL'S REPRESENTATION WAS ADEQUATE
(4) Defendant criticizes his trial attorney's alleged failure to call two witnesses who he contends "would have confirmed the fact that Lee and Tucker told them of Appellant's innocence." Such testimony would have been merely cumulative of similar impeaching evidence introduced at trial. (See People v. Huffman (1967) 248 Cal. App.2d 260 [56 Cal. Rptr. 255].) Defendant also contends his attorney should have called as witnesses the two juveniles who were in the car.
"The handling of the defense will not be declared inadequate merely because of the failure to call certain witnesses." (People v. Carreras (1963) 216 Cal. App.2d 807, 810 [31 Cal. Rptr. 436].) Appellate courts do not usually second-guess trial counsel's tactical choices. It is a matter of speculation as to how these four persons, if called, in fact would have testified. (See People v. Brooks (1966) 64 Cal.2d 130, 140 [48 Cal. Rptr. 879, 410 P.2d 383]; People v. Monk (1961) 56 Cal.2d 288, 299 [14 Cal. Rptr. 633, 363 P.2d 865]; People v. Fields (1969) 271 Cal. App.2d 500, 503 [76 Cal. Rptr. 358]; People v. Ferguson (1967) 255 Cal. App.2d 493 [63 Cal. Rptr. 93].) "Allegations of representation so inadequate as to amount to constitutional defect must be supported by more than speculative arguments." (People v. Durham (1969) 70 Cal.2d 171, 192 [74 Cal. Rptr. 262, 449 P.2d 198].)

ERROR OF THE COURT AND MISCONDUCT OF THE PROSECUTOR COMPEL REVERSAL
As we have pointed out, two of defendant's companions in the car  *45 Tucker and Lee  were key prosecution witnesses. They were originally jointly charged with defendant, but before defendant's trial the robbery charge against Tucker and Lee was dismissed on the People's motion for insufficiency of the evidence. At trial, upon direct examination of Tucker, the prosecutor elicited testimony that the dismissal was based on that ground.
On cross-examination, defense counsel asked Tucker whether he had been told the charge would be dropped if he testified against defendant. Tucker replied, "No." The court then asked Tucker whether he had taken a lie detector test and whether the charge had been dismissed after such test. Tucker answered, "Yes."
(5) Tucker had not been impeached by any showing that the dismissal had an ulterior purpose or that he had some other motive to testify falsely. Evidence to rehabilitate him, therefore, was premature. Under any circumstances, the court's assumption of a rehabilitative function would have been a questionable exercise of its authority. (See People v. Ramirez (1952) 113 Cal. App.2d 842, 852 [249 P.2d 307].) In the circumstances at bench, the court's inquiry of Tucker was clearly erroneous. It was tantamount to receiving into evidence the results of his lie detector test.[1] Its probable impact on the jury was to place the badge of credibility on Tucker's other testimony incriminating defendant.
Defendant did not object to the court's interrogation of Tucker. However, we are not called upon to weigh the effect of the court's questions in isolation, and to decide whether they caused irreparable damage once they were asked, thus rendering any objection futile. (See People v. Byrd (1948) 88 Cal. App.2d 188, 192 [198 P.2d 561]; People v. Frank (1925) 71 Cal. App. 575, 585-586 [236 P. 189].) (6) When the error of the court is considered in conjunction with the misconduct of the prosecutor  to which we will next refer  it is plain that defendant was denied a fair trial.[2]
*46 Lee on direct examination, and Tucker on redirect, each testified that after his arrest he told sheriff's deputies the same facts as were covered by his testimony. Deputy Sheriff Pile later testified that he interrogated the five occupants of the car at the sheriff's office subsequent to their arrest. The prosecutor then elicited the following facts from the deputy:
"Q. Specifically now did you question an individual by the name of Leon Isiah Tucker?
"A. Yes, sir.
"Q. And did Mr. Tucker give you information concerning what had happened?
"A. Yes, sir.
"Q. Will you tell us please ... what Mr. Tucker told you?
"MR. FIRTH [defense counsel]: If the Court please, I am going to object upon the ground this is hearsay....
"MR. REGAN [prosecutor]: ... But the basic purpose, your Honor ... it is acceptable hearsay having been raised by counsel himself while attempting to show through the People's witnesses both Tucker and Lee that what they were saying is a recent fabrication.... I am trying to establish, your Honor, that on the very night ... that this incident occurred and they were arrested that they told this officer exactly what they have told the jury from the witness stand today.
"THE COURT: Objection will be sustained.
"MR. REGAN: Q. But you did take a statement from Mr. Tucker, is that correct?
"A. Yes, sir.
"Q. Did you take a statement also from Mr. Lee?
"A. Yes, sir, I did.
"Q. How about the defendant, did he make a statement of any kind?
"A. No, sir, he refused." (Italics ours.)
Thereafter, defendant took the stand and testified, "I didn't make a statement because I didn't know what had happened and I wasn't going to jeopardize myself saying anything.... I asked for an attorney. That was my right." On defendant's cross-examination, the prosecutor interrogated him as follows in an attempt to discredit his defense that he was in a drunken sleep at the time of the robbery:
*47 "Q. You didn't make a statement, you didn't say anything, is that correct?
"A. Correct.
"Q. But today from the witness stand you want the ladies and gentlemen of the jury to believe that you at that particular time that night were sound asleep in the back of the car, is that correct?
"A. I was.
"Q. All right. Fine. Now answer this question: When did you ever tell anybody in law enforcement that you were asleep in the back of that car other than today from that witness stand?
"MR. FIRTH [defense counsel]: Objected to if the Court please.
"THE COURT: Objection will be sustained.
"MR. REGAN [prosecutor]: Q. Have you ever told anybody that?
"MR. FIRTH: Same objection.
"THE COURT: Same ruling." (Italics ours.)
(7a) By eliciting the deputy sheriff's testimony that defendant had refused to make a statement, the prosecutor committed a flagrant violation of defendant's right to remain silent  a violation which the prosecutor repeated by asking the defendant himself whether he had ever told law officers that he was asleep.[3] Nothing in the record suggests that the prosecutor was led into his misconduct by any trial tactic of defendant's attorney. (Cf. People v. Perry (1969) 271 Cal. App.2d 84, 105-106 [76 Cal. Rptr. *48 725]; State v. Stuart (Mo. 1970) 456 S.W.2d 19, 22; State v. Yager (Mo. 1967) 416 S.W.2d 170, 172.) Nor did the prosecutor claim surprise when the deputy sheriff's testimony disclosed defendant's refusal to give a statement. (Cf. People v. Bustamonte (1969) 270 Cal. App.2d 648, 656-657 [76 Cal. Rptr. 17].) On the contrary, the persistence with which he inquired about defendant's silence marks the prosecutor's transgression as intentional. The record leaves no doubt that the prosecutor had embarked on a calculated effort to convert the defendant's silence into a tacit admission of guilt.
(8) It is a prosecutor's duty "to see to it that those accused of crime are afforded a fair trial." (People v. Talle (1952) 111 Cal. App.2d 650, 677 [245 P.2d 633].) "The role of the prosecution far transcends the objective of high scores of conviction; its function is rather to serve as a public instrument of inquiry and, pursuant to the tenets of the decisions, to expose the facts." (People v. Franklin (1961) 194 Cal. App.2d 23, 29-30 [14 Cal. Rptr. 375].)
(7b) Although defense counsel objected when defendant was asked whether he had made a pretrial disclosure of his defense, he did not object when the deputy sheriff was asked whether defendant had given him a statement. Nor did counsel move to strike the deputy's response and request that the jury be admonished to disregard it. The prosecutor's misconduct was of such serious nature, however, that no objection, motion or request was necessary to preserve the point for appeal. (People v. Reese (1963) 220 Cal. App.2d 143, 147 [33 Cal. Rptr. 561]; Jones v. State (Fla.App. 1967) 200 So.2d 574; State v. Stuart, supra, 456 S.W.2d at p. 22; Witkin, Cal. Criminal Procedure (1963) § 750, pp. 723-724.)
(9) The right which was violated is of constitutional origin. Accordingly, the effect of that violation must be measured by the "harmless error" test of Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].[4] Upon an examination of the entire record, it appears reasonably possible that the prosecutor's misconduct might have materially influenced the jury in arriving at its verdict. (See People v. Haston (1968) 69 Cal.2d 233, 257 [70 Cal. Rptr. 419, 444 P.2d *49 91].) Indeed, such influence seems probable. (Cf. People v. Vienne (1956) 142 Cal. App.2d 172 [297 P.2d 1027].)
The judgment is reversed. The appeal from the order denying a new trial is dismissed.
Friedman, Acting P.J., and Regan, J., concurred.
NOTES
[1] See People v. Carter (1957) 48 Cal.2d 737, 751-752 [312 P.2d 665]; People v. Parrella (1958) 158 Cal. App.2d 140, 147 [322 P.2d 83]; People v. Aragon (1957) 154 Cal. App.2d 646, 658 [316 P.2d 370]; People v. Wochnick (1950) 98 Cal. App.2d 124, 128 [219 P.2d 70]; Kaminski v. State (Fla. 1953) 63 So.2d 339; Mattox v. State (1961) 240 Miss. 544 [128 So.2d 368]; State v. Parsons (1964) 83 N.J. Super. 430 [200 A.2d 340, 342-345]; Nichols v. State (Tex. Crim. App. 1964) 378 S.W.2d 335; cf. Johnson v. State (Fla.App. 1964) 166 So.2d 798; State v. Mottram (1962) 158 Me. 325 [184 A.2d 225, 227-231]; State v. Arnwine (1961) 67 N.J. Super. 483 [171 A.2d 124].
[2] After Tucker left the witness stand, Lee testified that he was told the charge against him "would be dismissed if I took the polygraph test and passed." Since there is no indication the jurors were aware that "polygraph" means "lie detector," we do not assess the court's affirmative comment that Lee "[t]ook a polygraph test and passed it." (Italics ours.)
[3] People v. Haston (1968) 69 Cal.2d 233, 254-257 [70 Cal. Rptr. 419, 444 P.2d 91]; People v. Ridley (1965) 63 Cal.2d 671, 674-676 [47 Cal. Rptr. 796, 408 P.2d 124]; People v. Cockrell (1965) 63 Cal.2d 659, 669-670 [47 Cal. Rptr. 788, 408 P.2d 116]; People v. Crawford (1967) 253 Cal. App.2d 524, 534-536 [61 Cal. Rptr. 472]; People v. Maldonado (1966) 240 Cal. App.2d 812, 816-817 [50 Cal. Rptr. 45]; People v. Stewart (1965) 236 Cal. App.2d 27, 31 [45 Cal. Rptr. 712]; People v. Reese (1963) 220 Cal. App.2d 143 [33 Cal. Rptr. 561]; People v. Vienne (1956) 142 Cal. App.2d 172 [297 P.2d 1027]; People v. Talle (1952) 111 Cal. App.2d 650, 675-676 [245 P.2d 633]; Gillison v. United States (1968) 399 F.2d 586 [130 App. D.C. 215]; United States v. Mullings (2d Cir.1966) 364 F.2d 173; Helton v. United States (5th Cir.1955) 221 F.2d 338; State v. Galasso (Fla. 1968) 217 So.2d 326; Jones v. State (Fla.App., 1967) 200 So.2d 574; State v. Stuart (Mo. 1970) 456 S.W.2d 19; State v. Vainikos (Mo. 1963) 366 S.W.2d 423; State v. Ford (1969) 80 N.M. 649 [459 P.2d 353]; People v. Travato (1955) 309 N.Y. 382 [131 N.E.2d 557]; People v. Masters (1968) 30 App.Div.2d 723 [291 N.Y.S.2d 230]; cf., People v. Summerfield (1968) 262 Cal. App.2d 626 [69 Cal. Rptr. 10].

See also People v. Ellis (1966) 65 Cal.2d 529, 536 [55 Cal. Rptr. 385, 421 P.2d 393]: "It is clear that `it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation.' (Miranda v. Arizona (1966) 384 U.S. 436, 468, fn. 37....)"
[4] See People v. Haston (1968) 69 Cal.2d 233, 257 [70 Cal. Rptr. 419, 444 P.2d 91]; People v. Bustamonte, supra, 270 Cal. App.2d at p. 657; People v. Summerfield (1968) 262 Cal. App.2d 626, 632 [69 Cal. Rptr. 10]; People v. Crawford (1967) 253 Cal. App.2d 524, 536 [61 Cal. Rptr. 472]; People v. Norman (1967) 252 Cal. App.2d 381, 393 [60 Cal. Rptr. 609]; Gillison v. United States (1968) 399 F.2d 586, 588, fn. 8 [130 App. D.C. 215]; State v. Ford (1969) 80 N.M. 649 [459 P.2d 353, 355].